### CHICAGO, R. I. & P. R. CO. v. LOVEJOY.

### CHICAGO, R. I. & P. R. CO. v. HOME TRUST & SAVINGS BANK OF OSAGE, IOWA.

### LOVEJOY v. CHICAGO, R. I. & P. R. CO.
### Nos. 14627, 14628, 14629.

United States Court of Appeals
Eighth Circuit.
July 8, 1953.

B. A. Webster, Jr., Des Moines, Iowa (R. L. Read and A. B. Howland, Des Moines, Iowa, on the brief), for Chicago, R. I. & P. R. Co.

Don W. Burington, Mason City, Iowa (Frank Elwood, Cresco, Iowa, and Wm. H. Salisbury, Osage, Iowa, on the brief), for Ralph G. Lovejoy, as Administrator of the Estates of Albert W. Lovejoy, Deceased, and Mary Josephine Lovejoy, Deceased, and Home Trust & Savings Bank of Osage, Iowa, as Guardian of the Property of Robert Lovejoy, a Minor.

Before GARDNER, Chief Judge, and JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

An automobile truck, driven by its owner and containing his wife and their 9-year old son as guests, collided with a passenger train, at a highway crossing, about two miles north of Mason City, in the State of Iowa. The father and the mother were killed, and the boy was injured.

The personal representatives of the two decedents' estates and the guardian for the minor brought separate suits against the Railroad, under Iowa law, for damages. The cases were tried together, before a jury. The court submitted the action for the mother's death and the action for the child's injuries to the jury, and it returned a verdict in each case for the plaintiff. In the action for the driver's death, the court directed the jury to return a verdict for the defendant.

The Railroad has appealed from the judgments in the mother's case and the son's case, and the personal representative has appealed from the judgment in the driver's case.

The sole question on the Railroad's appeals is whether there was evidence of negligence on its part sufficient under Iowa law to entitle these two cases to go to the jury on the charges which the court submitted. The Railroad had made a motion generally for a directed verdict in each case at the close of all the evidence, and, upon the court's denial of this motion, it sought to have each specification of neg-

ligence charged in the complaint separately withdrawn from the jury's consideration. The court permitted the cases to go to the jury upon two of the specifications or charges only, namely, that the whistle of the engine had not been sounded and that its bell had not been rung, in accordance with the requirements of Code of Iowa, 1950, I.C.A., § 478.19.

That statutory section provides: "A bell and a steam whistle shall be placed on each locomotive engine operated on any railway, which whistle shall be twice sharply sounded at least sixty rods before a road crossing is reached, and after the sounding of the whistle the bell shall be rung continuously until the crossing is passed; * * * and the company shall be liable for all damages which shall be sustained by any person by reason of such neglect."

The court viewed the evidence which the plaintiffs had adduced as containing sufficient probative substance to be capable of supporting a finding by the jury that the whistle of the engine had not in fact been sounded or its bell rung, as required by the statute, and instructed that, if the jury found that the Railroad had failed to observe either of these provisions of law and that such failure had been a proximate cause of the collision, then it should return a verdict for the plaintiff in the amount of any damages established. The Railroad contends that the evidence was, under the standard of Iowa law, without sufficient basis for allowing a jury to consider whether there had been a violation of the statute in either respect.

■ Iowa law regards testimony by witnesses that they did not hear the whistle or the bell of a train as not affording a sufficient basis for the making of a finding by a jury that the whistle was not sounded or the bell was not rung, unless the court is able to say, from the witnesses' own testimony or on the circumstances otherwise shown, that their position and attitude were such as reasonably to give rise to a probability that these things would have been heard by them in the particular situation had they been done. See Hoffard v. Illinois Central Ry. Co., 138 Iowa 543, 110 N.W. 446, 449, 16 L.R.A.,N.S., 797; Morgan v. Iowa Central Ry. Co., 151 Iowa 211, 130 N.W. 1058, 1059; Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109, 194 N.W. 188, 190; Anderson v. United States R. R. Administration, 203 Iowa 715, 211 N.W. 872, 874; Chilcote v. Chicago & N. W. R. Co., 206 Iowa 1093, 221 N.W. 771, 773; Mann v. Des Moines Ry. Co., 232 Iowa 1049, 7 N.W.2d 45, 57. It is, of course, knowledge, not lack of knowledge, that is the basis of a witness's right to persuade a jury, and the probability which the court must be satisfied exists in such a case is merely the legal standard of certainty necessary to be met for practicably insuring that a witness is testifying from sensory knowledge and not the lack of it. Quite frequently, the conscientious witness will himself be perplexed and bothered, to the point of reluctance on the stand, by just why he has come to have the impression and conviction that he does in the particular situation.

To establish their charge that the whistle of the train had not been used to give the required crossing-warning, the plaintiffs called seven witnesses to the stand. Four of these were youths of high school age, who were engaged in playing pinochle with each other in a house located approximately 100 to 150 feet from the crossing. The effect of their testimony was simply that their attention had not at all been attracted until the impact occurred and that none of them recalled having heard a previous whistle. It was not even attempted to be shown that they generally did hear the whistle of trains approaching the crossing. One of them frankly characterized the situation, by stating that, for his own part, he had in the past, when he had been outside the house, watched trains go by the crossing and on some of these occasions he had heard their whistle and on others he had not, but that "there are so many trains, they don't bother me any more."

The injured boy also testified that "I did not hear any whistle blow on the train" but further said that he was sitting between his father and his mother in the truck, was engaged in reading a comic book at the time, did not pay any attention to the

road or anything along it, and had had no thought in any way that they were approaching a railroad crossing.

Another witness—a woman, who lived about 900 feet from the crossing and was engaged in baking cookies at the time—testified that she was able ordinarily to hear the whistle of approaching trains plainly inside the house and that on the occasion of the accident she had not heard any whistle. But her attitude and attention at the time were shown to have been such that she had not even heard the alarm blasts, which undisputedly had been sounded just as or after the collision occurred, and she was not aware that anything had happened until she subsequently was informed by other persons. She stated that she had heard some kind of a noise but her impression then had been that it came from her oven.

The testimony of the seventh witness, however, was of a stronger nature. He was a dairy farmer, who lived about 800 feet from the crossing, and who was sitting in his living room when the accident occurred. He had been looking out the window, down the road, toward the crossing. He had seen the truck go by and watched it until just before it reached the crossing, when he had turned his head away from the window. He heard the crash of the collision and three or four sharp blasts of the whistle practically contemporaneously with it. These alarm blasts he had heard very clearly but he had not heard any previous soundings of the whistle. He ordinarily paid attention to this particular train, which was a "streamliner" with a diesel engine and an air whistle, and which thus still had a novelty of attraction for him.

This witness's testimony was such, we think, as fairly entitled it to be held that his position and attitude reasonably gave rise to a probability that he would have heard the whistle if it had been previously sounded, and that what he said was therefore capable of being found by a jury to amount to sensory knowledge. While the testimony of the other six witnesses would not of itself seem sufficiently strong to provide a legal basis, within the rule stated above, for a finding that the whistle was not sounded as required by statute, the testimony of the seventh witness, as we have said, was possessed of a sufficient probative basis for finding sensory knowledge, to warrant the court in submitting the question to the jury, on the whole situation, of whether there had been a failure so to sound the whistle.

As to the charge that the bell had not been rung as required by the statute, plaintiffs made interrogation of only three of their witnesses—the injured boy and two of the youths who had been engaged in playing pinochle.

The injured boy testified simply, as he had done about the whistle, that he did not hear any bell. But, as heretofore indicated, he was occupied at the time in reading a comic book, was paying no attention to the road or anything along it, did not know that any railroad crossing was near, and had no occasion to have any thought at all about a train.

Of the two pinochle players, one testified merely that he did not hear any bell from the train, with nothing to show or suggest that he ever had heard the bell on any train approaching the crossing either outside or inside the house, or that the bell even could be heard inside the house where he was sitting—much less to indicate that it was at all possible to hear it there in ordinary course, on a winter's day, with the doors and the windows of the house all naturally closed. The second youth testified that he did not "recall" hearing any bell and, when asked whether he had ever heard the bell, while he had been outside the house and had watched a train go by, he replied, "I have never listened to the bell if it has a loud whistle to it." Also, this was the same witness, whose general attitude as to passing trains at the time of the accident had been characterized by himself in his previously quoted testimony that, "there are so many trains, they don't bother me any more."

It does not seem to us that there is in this sparse testimony, either separately or collectively, any natural basis for saying that the position and attitude of any of these three witnesses reasonably made it proba-

ble in the situation that he would have heard the bell on the approaching train, if it had been rung [1]—and the more compellingly so, since there is not any indication, even as a general guide, of what distance the bell of the streamliner could be or ever had been heard by anyone in any position. [2]

▮ Since the instructions of the court permitted the jury to return a verdict generally for the plaintiffs, if either the whistle was found not to have been sounded or the bell was found not to have been rung, and since there is no way of knowing upon what ground the jury predicated its verdicts, the judgments in the two cases in favor of the plaintiffs are required to be reversed. Cf. Roth v. Swanson, 8 Cir., 145 F.2d 262, 269; Northern Pacific Ry. Co. v. Haugen, 8 Cir., 184 F.2d 472, 480.

The question on the personal representative's appeal in the case for the driver's death is whether the evidence relating to the driver's freedom from contributory negligence was such as to create an issue for the jury. The court directed a verdict for the defendant upon the ground that the evidentiary elements of the situation would not enable a jury to say that such things had been done or not done by the driver as would make him free from contributory negligence, and that the plaintiff therefore had not sustained the burden resting upon him under Iowa law of establishing a sufficient basis on the whole evidence for a finding that such freedom existed.

▮ The first contention of the personal representative is that the question of the driver's freedom from contributory negligence was entitled to have gone to the jury upon the presumption of due care recognized as to a decedent's actions generally. Such a presumption, however, as to the actions of the driver of a vehicle in a railroad-crossing accident, is recognized by Iowa law, only where no eye-witness testimony has been produced by either party as to the decedent's conduct or the movements of his vehicle during the material

moments preceding the collision, and if the physical facts of the situation do not give rise to the existence of contributory negligence on his part as a matter of law. See Mast v. Illinois Central R. Co., D.C.,N.D. Iowa, 79 F.Supp. 149, 165, 166, affirmed, 8 Cir., 176 F.2d 157 and the Iowa cases there exhaustively collated; also Rickabaugh v. Wabash R. Co., 242 Iowa 746, 747, 44 N.W.2d 659.

The presumption thus recognized in such a "no eye-witness" situation is permitted to carry the question of the deceased driver's freedom from contributory negligence to the jury for resolution by it in relation to all the facts and circumstances which the evidence shows. Id., 79 F.Supp. at page 165. But where there is eyewitness proof of the actions of the decedent, from observation either of his conduct or the movements of his vehicle, through the material moments preceding the collision, the no eye-witness rule and its presumption are, as we have stated, under Iowa law, without any application. Rickabaugh v. Wabash R. Co., supra, 242 Iowa 747, 44 N.W.2d 659. In such a situation, the question of the decedent's freedom from contributory negligence, in its right or lack of right to go to the jury, will turn upon the evidence of conduct, vehicular movements and circumstances which has been produced.

In the present situation, the dairy farmer, previously referred to, testified that he had observed the decedent's truck proceed toward the crossing for approximately 800 feet, at a speed of around 25 miles per hour, and that he had kept watch of it until it was "not quite up to the crossing." The engineer of the train testified to having seen the truck from the time that it was about 165 feet away from the crossing and that it remained within the line of his vision from the cab until it got to within a distance of 15 feet from the engine, when it would momentarily be below and out of sight. The evidence also indicated that the engine had been struck by the truck, in that it was the curved side of the diesel,

---

1. There was testimony by members of the train crew that both the whistle and the bell had been properly used, but this, of course, is not controlling on the question being considered.

2. This fact is of some significance, in the light of evidence on the part of the plaintiffs as well as the defendant, that the streamliner itself, with its usual speed, gave rise to substantial enveloping noise.

just back of the front end, and not its tip or nose, which was damaged. The engineer stated that the truck had appeared to him to slow down some as it came close to the crossing and then suddenly, just before the impact occurred, to accelerate its speed.

The movements of the truck thus were, as the trial court stated, the subject of eye-witness testimony, through the material moments preceding the collision, indicative of some actions which the deceased, vehicularly at least, had either taken or failed to take, and so to warrant the court, under the Iowa decisions, in refusing to permit the case to go to the jury upon the no eye-witness rule and its presumption. An attempt has been made to argue that the testimony of the engineer as to his observation of the truck could not be said to be so positive as to remove the situation from the application of the no eye-witness rule, in that he did not unequivocally reaffirm, under the interrogation of cross-examination, that he was absolutely certain that he had watched the truck at all times but merely stated that he believed or thought that he had done so. What he had described, however, as the trial court declared, left no fair room for argument that all of the material moments of the truck's movements might not have been covered by the observation which he had made.

The personal representative further contends that, even without the benefit of the no eye-witness rule presumption, the situation still was one, on the movements of the truck and the circumstances shown, where the question of the driver's freedom from contributory negligence was required to be submitted to the jury.

We are not called upon to examine the question further than to assure ourselves that the trial court's considered appraisal was not one which under Iowa law must be declared to be clearly erroneous. We do not think that it can be said that such a declaration is legally compelled in the present situation.

It is necessary to bear in mind that the burden which Iowa law imposes generally, upon one seeking to recover damages on account of the negligence of another, to establish his own freedom from contributory negligence, has never been treated as being an easy one legally. In fact, the Iowa rule has frequently been criticized academically as being harsh and "peculiar" in its concept and consequence. And in the application of the burden to a deceased driver in a railroad-crossing accident, unless the situation is one in which the presumption of the no eye-witness rule is entitled to be invoked, the task of sustaining the burden has oftentimes proved to be an impossible one practicably. But the spirit underlying the origin and history of the rule itself has apparently made the Iowa Supreme Court feel unfree, in situations outside the narrow no eye-witness rule, as a matter of imperiling the standard fundamentally, to engage in much liberalization simply because of the practical difficulties of proof with which the plaintiff may be faced in this particular class of case. The trial court has accordingly been allowed, as in other cases, to view the evidence objectively, as it stands, regardless of the fact that a decedent is involved. Unless the evidence is capable legally, on the basis of probativeness and substantiality, as in other situations, of persuading that freedom from contributory negligence has existed and so of supporting such a finding, the court is not required to submit the question to the jury but may direct a verdict on it.

In the present situation, the evidence showed undisputedly that there was a conventional, railroad-crossing, warning sign, located on the side of the road, about 500 feet from the crossing, plainly visible to an on-coming motorist, on a dry, clear day such as was involved. Any approaching train was capable of being seen for a distance of about a mile at this point. Nearer the crossing, there was a schoolhouse, which, with its surrounding trees and brush and a nearby bank, created some obstruction to the view, but a view up the tracks was again without any obstruction some distance before the crossing itself was reached. There also was another plainly visible, cross-arm sign showing the existence of the crossing, before the tracks were reached. It does not seem reasonably possible to say, without something probative to show that such was not the actual fact in

the specific situation and that this non-existent fact had an exculpatory basis in relation to the particular occasion, that anyone, whether familiar with the crossing or not, would not ordinarily have become aware of the existence of the crossing before it was reached, would not have taken some step to look for a train, and would not have seen it and have avoided the collision had he done so. Whatever partial obstruction might have existed as to some of the 500-foot distance between the warning sign and the crossing, before there again was a clear and sufficient view up the tracks, would, if anything, in relation to the question now being considered, under the Iowa decisions, only accentuate the driver's duty of care and caution, when he knew or legally must be regarded as having known of the existence of the crossing. Dean v. Chicago, B. & Q. R. Co., 211 Iowa 1347, 1351, 229 N.W. 223, 225; Nurnburg v. Joyce, 232 Iowa 1244, 1252, 7 N.W.2d 786, 791.

Here, as against the normal force of the setting shown, we do not think that there is anything which can be held, under the Iowa decisions, to establish probatively, as a basis for permitting a jury to consider the question, that the decedent did not in fact know that he was approaching the crossing or, if he did not, why it was that he did not, and, if he did know, what he could be said to have done as a matter of care in watching for a train. The deficiency is, of course, one which ordinarily might be supplied, for purposes of taking the question to the jury, by the driver's own testimony, where he survives. But, as we have indicated, we do not believe that the trial court was required to hold, on the basis of the testimony, facts and circumstances produced in the present case, that a jury was entitled to resolve whether the driver knew that he was approaching a crossing, whether he looked at any spot that might be found to be appropriate in the circumstances, or whether he did or did not do anything that made him guilty of or free from contributory negligence in thus colliding with the train.

We must accordingly hold that the trial court's ruling that the jury was not entitled

to pass upon whether the decedent had or had not been free from contributory negligence was not in the situation clearly erroneous as a matter of Iowa law. And, of course, the criticism made by the personal representative of some of the Iowa decisions and their legal consequence in this class of cases is not a matter for the consideration or concern of a federal court.

The judgments in Nos. 14,627 and 14,628 are reversed, and the judgment in No. 14,629 is affirmed.