VELMA PAULSEN, as administratrix, and HARRY PAULSEN, as administrator, of estate of Mary Karen Paulsen, deceased, appellees, v. ERNEST FRANK HAKER et ux., appellants.

No. 49614.

(Reported in 95 N.W.2d 47)

534

FEBRUARY 10, 1959.

Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, and James T. Remley, of Anamosa, for appellants.

Rees & Remley, of Anamosa, for appellees.

THOMPSON, C. J.—Plaintiffs are the administrators of the estate of their daughter, Mary Karen Paulsen, who was killed as a result of a collision between an automobile in which she was riding as a passenger and another driven by Ernest Frank Haker and owned by both defendants. The issues were submitted to a jury, which returned a verdict for the plaintiffs in the sum of $15,000.

On January 1, 1956, in the early afternoon, Richard McCalmant, then age 16, was driving a 1955 Chevrolet automobile owned by his father, George William McCalmant. He picked up Donald Martin Carstensen, age 17, the decedent, Mary Karen Paulsen, 16, and Janet Kay Thompson, about the same age, in the town of Wyoming. The two girls were killed in the accident, and neither of the boys, who survived, remembers anything about it. McCalmant had no recollection of any of the events of the afternoon, but Carstensen recalled what had happened during the early part of the drive and until they were within perhaps a mile of the point of the accident. He testified that up to that point he was riding in the front seat beside the driver and the two girls were in the rear. The position of the occupants of the car seems to be sufficiently established by this testimony, and is not challenged by the defendant-appellant.

The McCalmant car, proceeding south on a county road, reached Highway No. 64 about three p.m. Highway No. 64 is an arterial highway paved 18 feet wide. It was guarded on the north at the intersection of the county road on which the McCalmant car was traveling by a stop sign on a post 4 feet 4 inches in height located 51 feet north of the center of the paving on No. 64. As has been indicated there is no evidence from the occupants of the McCalmant car as to what happened at the intersection. However, as it reached the stop sign, a 1953 Buick automobile owned by the defendants and driven by Ernest Frank Haker, who was alone, approached from the west.. Haker testified that he was driving at about 60 miles per hour, and that he observed the McCalmant car coming along the county road from the north when he was 300 to 400 feet from the intersection. He said it stopped after passing the stop sign, then when he was about 50 to 100 feet from the intersection it suddenly started up and "darted" across the pavement in front of him. He testified the car was about 8 to 10 feet from the pavement when it stopped, which seems to mean it had proceeded some 30 feet or more past the stop sign before obeying it. Haker did not sound his horn, apply his brakes, or change the direction of his car, and it hit the McCalmant car somewhat back of the right center. The McCalmant car had crossed the north half of the pavement and apparently the front wheels were some four or five feet south of the south edge when it was struck. The Chevrolet car came to rest 103 feet east and slightly south of the center of the intersection, on top of a steel gate in a fence. It had destroyed 40 feet of the fence in its path. The fence was 32 feet south of the south edge of the pavement on No. 64. The Buick car was about 56 feet east of the Chevrolet, also along the fence. The Chevrolet was almost entirely demolished, the Buick considerably damaged. Plaintiffs' decedent and Janet Kay Thompson were killed in the collision; Richard McCalmant was badly injured and was unconscious for 73 days; Carstensen received a broken leg, and says "I got hit pretty hard in the stomach; I had kidney trouble, brain concussion, I guess." Most of the facts set forth above are not in serious dispute, and all of them have some substantial support in the testimony.

I. Plaintiffs' petition charged the defendant driver with

negligence according to these specifications: (a), driving at an excessive speed under the existing circumstances; (b), in failing to have his automobile under control; (c), in failing to keep a proper lookout; and (d), in failing to have his car under proper control and reducing speed to a reasonable and proper rate when approaching and traversing a highway intersection. These were each submitted to the jury, with definitions which are not in themselves challenged here, except as it is contended that there was no evidence to support them. Defendants assign three errors relied upon for reversal: 1, refusal of the trial court to direct a verdict in their favor; 2, a closely related proposition, denial of their motions to withdraw pleaded issues from the jury, which would necessarily have resulted in a directed verdict; and 3, denial of their motion for judgment notwithstanding verdict and for new trial.

Two basic questions are involved in this appeal: first, was a jury question engendered on the issue of the negligence of Ernest Frank Haker, the driver of defendant's car; and second, was there sufficient evidence of the freedom from contributory negligence of Mary Karen Paulsen, plaintiffs' decedent, to warrant submission of this issue? We are not concerned here with the burden of proof on either of these points, but only with the sufficiency of the evidence to raise a jury question upon one or both. We shall first consider the matter of the showing of the negligence of the defendant driver.

██ II. We are not here concerned with the negligence, if any, of the driver of the McCalmant car, unless it was the sole cause of the accident so that no negligence of the defendant Haker concurred therein. Law v. Hemmingsen, 249 Iowa 820, 826, 89 N.W.2d 386, 391. And the principle, that when we are considering the propriety of a ruling upon a motion for directed verdict the evidence must be taken in its aspect most favorable to plaintiff it will reasonably bear, is so well settled that citation of authority is needless. Likewise, we need not elaborate upon the rule that a traveler upon the highway has a right to assume that others will proceed with due care and according to law, until, in the exercise of reasonable care, he knows, or should know, otherwise. It is in the light of these well-established legal maxims that we must consider the case before us.

The true rule is that the statutory right of way is not a guarantee of safety, but that the driver on the protected road must use reasonable care under the existing circumstances for his own safety and that of others. Likewise, in connection with the duty to keep a proper lookout, we think it is his duty to make reasonable observation of all surrounding circumstances, including intersections and other traffic which may be in fair view on intersecting roads, and to use such care as an ordinarily prudent man would do in the light of everything disclosed by such observations. It is true the trial court's Instruction No. 11 limited this duty to keeping a lookout for other vehicles "on the highway on which he was driving." This was error prejudicial to the plaintiffs, but, of course, the defendants may not complain of a ruling in their favor. In Arnold v. Krug, 279 Mich. 702, 708, 273 N.W. 322, 324, a case cited by both plaintiffs and defendants, the rule is thus stated: "* * * he must keep such lookout ahead and to the sides and down intersecting highways as a reasonably prudent person would do in order to discover possible danger and must act carefully upon existing conditions." Schall v. Penn Transit Co., 352 Pa. 129, 132, 42 A.2d 278, 279, is to the same effect: "Therefore the operator of a vehicle on a through highway may not, notwithstanding his superior right of way, rely blindly upon an assumption that the operator of a vehicle on an intersecting road or street will obey the law; he must be reasonably vigilant to observe traffic conditions on the intersecting highway * * *." 5A Am. Jur., Automobiles and Highway Traffic, section 323, page 429, says: "The driver on the favored highway does not have the absolute right of way in the sense that he is not bound to exercise any care toward traffic on intersecting highways; he is bound to exercise ordinary care. While it is sometimes said that the right of way of a motorist on a street protected by stop signs is a 'permissive,' 'relative,' or 'qualified' right, and not an 'absolute' one, it is generally recognized that this does not relieve the motorist on the favored highway from the duty of exercising due care."

Defendants' disagreement with the trial court is in the application of the foregoing principles rather than in the rules themselves. They cite Greenfeld v. Hook, 177 Md. 116, 8 A.2d

888, 136 A. L. R. 1485, in support of their contention that a driver on a favored highway need not slow at every intersection, but may drive at a lawful rate of speed, secure in the knowledge that he has the right of way and that an "inhibited" traveler must know that he violates the duty of stopping and yielding the right of way at his own peril. They also cite Breker v. Rosema, 301 Mich. 685, 4 N.W.2d 57, 141 A. L. R. 867, to the same effect. It is interesting to note, however, that in the latter case the Michigan Supreme Court was concerned with the claim that the driver of the car on the protected road was guilty of contributory negligence as a matter of law. The Michigan court said (page 690 of 301 Mich., page 59 of 4 N.W.2d) : "Assuming that the driver saw what was plainly to be seen, it at least becomes a jury question whether he, as a reasonable man, would not expect the car on the inferior road to observe the law and stop under the circumstances." In Krause v. Ryan, 344 Mich. 428, 74 N.W.2d 20, the plaintiff was the favored driver. She reduced her speed as she approached an intersection from 50 to 30 miles per hour. She looked to her left when about 100 feet from the crossing, and saw the defendants' automobile approaching at a speed of 45 to 50 miles. She assumed defendant driver would stop and did not look again until his car was practically upon her. Again it is somewhat significant that the controversy concerned the alleged contributory negligence of the plaintiff, the driver on the superior road. The defendant relied upon, and a strong dissenting opinion agreed with, Holley v. Farley, 289 Mich. 676, 287 N.W. 341, in which under somewhat similar circumstances the favored driver was held guilty of contributory negligence as a matter of law. No one contended in the Krause case that the plaintiff might not have been found guilty of such negligence as a matter of fact, by the jury. The Michigan Supreme Court, after stating the rule that the driver on the superior highway has a right to presume the operator of the vehicle approaching on the inferior road will obey the rules of the road and the posted sign, said (page 432 of 344 Mich., page 22 of 74 N.W.2d) : "It should not, however, be assumed from the foregoing that he may proceed blindly upon the arterial, secure in the supposition that

he can do no wrong. He must remain alert to the hazards surrounding him and with which he is confronting others. * * * he is undoubtedly required to make observation of the traffic apparently to cross his path from intersecting streets and to act reasonably in the light of such observation."

We ourselves have held that the driver on the arterial street or highway may be guilty of negligence. Odegard v. Gregerson, 234 Iowa 325, 12 N.W.2d 559. The driver on the favored road may rely upon the belief that others using the highways, including those who may desire to enter from inferior intersecting roads, will obey the rules of the road and the posted signs and will use due care at least until he knows, or in the exercise of reasonable care should know, that they will not do so. But he is not thereby relieved of his own duty of due care under the existing circumstances. He may not proceed in entire disregard of traffic approaching or entering from intersecting roads, but must be alert to it to the extent reasonable care demands, and must govern his driving by the rules such care dictates.

What reasonable care may be will vary with the facts of each case. The problem for the court is to determine whether reasonable men might find, from the aspect of the evidence most favorable to the plaintiff, that there was a lack of due care on the part of the defendant. If so, there is a jury question; and this is true even though reasonable men might differ on the proper interpretation of the facts.

We turn then to a consideration of the evidence before us. It is of course not to be required under modern traffic conditions that a protected driver operate his vehicle so that he can make a full stop at each intersection; only that he proceed with such care and with his vehicle under such control as existing conditions, known or which should be known to him, may require. Code section 321.288(3) provides that a person operating a motor vehicle shall have the same under control and shall reduce the speed to a reasonable and proper rate: "3. When approaching and traversing a crossing or intersection of public highways, * * *." The trial court properly told the jury in its Instruction No. 10 that having a vehicle under control means being able to stop it with a reasonable degree of promptness or so that it "can be with reasonable promptness maneuvered

so as to guide and direct its course or movement in the manner willed by the operator, acting as the ordinarily careful and prudent driver would do under similar circumstances." We think this expresses the correct rule, and it is not challenged by the defendants. The record shows that the defendant driver was the only person who saw the collision who can testify directly as to what happened. The two boys who were in the McCalmant car do not remember the accident. Haker's testimony is that he saw the other vehicle approaching on the county road when he was about 300 to 400 feet from the intersection. It slowed down but did not stop at the stop sign, which was about 40 feet back of the north edge of the pavement on No. 64. An engineer's testimony is that the stop sign was 51 feet north of the center of the pavement. Haker further said that the McCalmant car came to a stop about 8 or 10 feet from the north edge of the pavement, then when he was 50 to 100 feet away it started again and "darted" across in front of him. He was driving at about 60 miles per hour at all times. He did nothing in the way of slackening speed or otherwise when he first saw the approaching automobile, or when it failed to stop at the stop sign; and when it started across the highway in front of him "There was no chance, no time to do anything."

Section 321.285, Code of 1954, provides that the driver of a motor vehicle upon a highway shall drive at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing. May v. Hall, 221 Iowa 609, 614, 266 N.W. 297, 299, is much relied upon by the defendants. There the defendant was driving at a speed which we described as "a very reasonable rate of speed. At no time was his car traveling over 33 miles per hour." Also, when he realized the car coming in from the inferior road did not intend to stop, he made an effort to avoid the collision by speeding up in an attempt to clear the crossing ahead of it. We think the facts shown in the instant case are sufficiently different to cross over the line between what requires a directed verdict and what calls for a jury determination. Here the defendant was by his own testimony driving at 60 miles per

hour, without any effort at any point to change the speed. The terrific damage inflicted also tends to show high speed. He did not sound his horn when he saw the McCalmant car had not stopped at the stop sign, and he made no effort to swerve, although the slightest change in direction would have avoided the accident. We are aware there is no specification of negligence based on failure to give warning; we cite the failure to blow the horn only by way of illustrating that the operator on the protected road may sometimes be able to do some things by way of precaution or warning instead of driving ahead in absolute reliance upon his right of way. It is also true he had not much time to swerve but a lesser speed would have given him more opportunity to maneuver. Since he did nothing, either by way of changing speed or direction, we hold that the case is within the area in which reasonable men might conclude he did not do all a prudent man would have done under the circumstances.

Section 321.321 requires a driver who enters a through highway at an intersection to stop and to yield the right of way to other vehicles which are approaching so closely on said through highway as to constitute a hazard; but this, as we have pointed out, does not absolve the driver on the favored highway from his duty to use reasonable care.

Section 321.345 also becomes of considerable significance in this case. It bears upon stop signs and the duty of a driver approaching one on an inferior road, in these terms:

"* * * Every stop sign shall be located as near as practical at the property line of the highway at the entrance to which the stop must be made * * *.

"Every driver of a vehicle * * * shall stop at such sign * * * before entering an intersection * * *."

We have quoted the material portions of the statute bearing upon the situation before us. It is evident therefrom that it was the duty of the driver of the McCalmant car to stop at the stop sign, some 51 feet from the center of the paving on which Haker was approaching. But by Haker's own testimony he did not do so. The point at which the vehicle on the inferior road should have stopped is also the point at which the driver on the protected highway should begin to take notice that it is not obeying the law. After passing the stop sign, the McCalmant

driver could no longer obey it; a stop nearer the pavement, even though made as Haker says it was, was still not an obedience to the statute. There is more to the statute than an order that drivers coming to a stop sign shall stop anywhere before they enter the traveled portion of a favored highway. They must not only stop, but at a certain designated place and distance from the point of danger on the intersection. It will not do to argue that as long as they stop before entering the danger zone they have sufficiently complied. They are directed by law to stop a certain distance back, and they disobey the law if they do not. If they do not stop there, the driver on the favored road will know they are not obeying the law; and even though they later stop, if through miscalculation of speed and distance, or failure to see the vehicle approaching on the protected highway, or through inadvertence or recklessness they start up again and attempt to cross, their failure to stop as the statute orders has given such driver some warning, an alert to possible danger. An attempt to cross by the restricted car after stopping at a stop sign 51 feet from the point of hazard is much less dangerous than an attempt to cross after a stop 8 or 10 feet from the pavement itself. In the first instance, the driver on the protected highway has an opportunity to see the violation at a considerably greater distance, and so take appropriate measures for his own protection and that of others. He has little chance to slow or maneuver when the vehicle on the inferior road makes its stop within a few feet of the pavement and then suddenly starts across. This is the matter which Haker stressed in his testimony: that he did not see the McCalmant car entering his path until it was too late to do anything. But he did see it pass the legal stop sign; he is held to have known that its driver was then disobeying the law; and we think it might be found that in the exercise of due care he should have done something more than to drive straight ahead without slackening speed or making any effort to get his vehicle under better control. True, the McCalmant car did finally stop; but at a point so close to the pavement that a situation of far greater danger was created when it started forward again than would have been the case if it had stopped at the sign 51 feet back and

then started across. The defendant driver was entitled to rely upon obedience to the law by McCalmant; but he knew, or should have known, it was not being obeyed when McCalmant did not stop at the stop sign, and it was still not being obeyed when he stopped where Haker says he did within a few feet of the pavement. We are unwilling to extend the rule of relying upon another observing the rules of the road and due care to the point of saying that under the facts shown here reasonable men might not find some lack of reasonable care on the part of the defendant driver. A jury might well find that something more than driving straight ahead at a high rate of speed in entire reliance upon his right of way was required of the defendant under the circumstances shown. We do not say he was negligent; only that the matter was for the jury to decide.

Mr. Justice Holmes has well put it in his The Common Law, at page 150: "The question what a prudent man would do under given circumstances is then equivalent to the question what are the teachings of experience as to the dangerous character of this or that conduct under these or those circumstances; and as the teachings of experience are matters of fact, it is easy to see why the jury should be consulted with regard to them."

 III. Another question of fact arises upon the matter of lookout. We have pointed out that the defendant driver testified that he saw the McCalmant car approaching when it was some 300 to 400 feet from the intersection; and that he saw it pass the stop sign and finally stop some 8 or 10 feet from the pavement. But there is evidence that shortly after the collision he said to a disinterested witness "How many did I kill?" and a moment later he mumbled something about "Where did they come from?" It is true the witness said "it was something to that effect. I can't just state what he said there." This is certainly subject to the interpretation that he said in effect that he did not know where the injured persons came from, the witness not being able to repeat the exact words. From this the jury might have found he was not keeping a lookout for traffic on the intersecting road, although it was in plain view for some hundreds of feet as his own testimony shows. We have pointed out that he had a duty as a careful and prudent driver to give heed to all the surrounding circumstances, includ-

544

ing vehicles approaching on intersecting highways. His testimony says he did; but his admission, if believed by the jury, showed the contrary.

IV. We are forced to conclude that there is no evidence from which the jury could properly find that plaintiffs carried the burden of showing the freedom of their decedent from contributory negligence. This was a burden incumbent upon them; it is too well established in Iowa that the plaintiff in an action such as this must plead and prove freedom from negligence contributing in any way to the injuries of which he complains to require elaboration. It will not do to say that since the decedent was riding in the rear seat and had no control of the driving she was necessarily free from any negligence. The question is substantial and we cannot ignore it.

A similar situation was recently before us in Plumb v. Minneapolis & St. Louis Railway Co., 249 Iowa 1187, 91 N.W.2d 380. There the plaintiff had been riding, either as a driver or a passenger, accompanied by one Baxley, in an automobile owned by plaintiff which was struck by a train at a grade crossing. Baxley was killed, and plaintiff, because of amnesia resulting from the collision, remembered nothing. There was no evidence as to which occupant was driving at the time. The trial court gave an instruction which told the jury "if the driver was free from contributory negligence it may be assumed the passenger was also free therefrom * * *." We reversed, holding that the passenger in an automobile may be guilty of contributory negligence regardless of the fault or lack thereof of the driver. We said, at page 1193 of 249 Iowa, page 385 of 91 N.W.2d: "It is doubtless true also that if plaintiff was only a passenger in his car at the time of the collision he was required to exercise ordinary care for his own safety although he was not required to exercise the same degree of vigilance in looking and listening as required of the driver." (Authorities cited.) Again, on page 1194 of 249 Iowa, page 385 of 91 N.W.2d is found this: "If plaintiff was a passenger in the car it does not follow he was free from contributory negligence from the fact, if it be a fact, the driver was free from negligence. The passenger occupied the right side of the seat, the direction from which the train approached, and a somewhat clearer view of it was available

to him than to the driver. Although the driver was required to exercise greater vigilance than the passenger, the latter could not entirely trust his safety to the former."

The negligence of the driver of the McCalmant car, if such there was, would not be imputed to the plaintiffs' decedent here. But she was required to exercise ordinary care for her own safety. The burden being upon plaintiffs to establish her freedom from negligence contributing to the injuries suffered, in the absence of any evidence whatever upon the question of what she did or did not do, it must be held as a matter of law their case has failed in this respect. See 65 C. J. S., Negligence, sections 150, 151, 152, pages 794, 795.

There is some discussion in the briefs as to the applicability of the no-eyewitness rule to the facts in the instant case. The reason for argument on this point is not apparent, since the rule was not submitted nor does the record show it was requested. The situation here is again much as it was in Plumb v. Minneapolis & St. Louis Ry. Co., supra. There we said that the contention plaintiff was entitled to the benefit of the no-eyewitness rule was not raised in the trial court. However, since the question is raised and argued in the briefs now before us, it is proper to point out that there was apparently no eyewitness who purported to remember what the decedent did at the time material here; that is, immediately preceding the accident. Cases, such as Rickabaugh v. Wabash Railroad Co., 242 Iowa 746, 44 N.W.2d 659, which hold that one who observes the course and manner of driving of an automobile is an eyewitness of the actions of the driver, are not in point. The course of the vehicle ordinarily will show nothing of the conduct of the passengers.

For the reasons stated in this division we conclude that the defendants' motion for new trial should have been granted. The cause is reversed and remanded, with directions to sustain the motion for new trial.—Reversed and remanded.

BLISS, GARFIELD, GARRETT, LARSON, OLIVER, PETERSON, and THORNTON, JJ., concur.