342 F.2d 830
 CARSTENS PLUMBING & HEATING COMPANY, Appellant,
v.
Betty Lou EPLEY, Executrix of the Estate of Harvey H. Epley, Deceased, Florence & Hartzell, Inc., S. Patti Construction Company, and Alliance Mutual Casualty Company, Appellees.
S. PATTI CONSTRUCTION COMPANY, Appellant,
v.
Betty Lou EPLEY, Executrix of the Estate of Harvey H. Epley, Deceased, Florence & Hartzell, Inc., Carstens Plumbing & Heating Company, and Alliance Mutual Casualty Company, Appellees.
 No. 17757.
 No. 17758.
 United States Court of Appeals Eighth Circuit.
 March 31, 1965.
 
 David R. Hardy and William W. Shinn, of Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., made argument for appellant, Carstens Plumbing & Heating Co. and filed brief with Donald K. Hoel and Mari W. Privette, of Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., and William S. Burnquist, Fort Dodge, Iowa.
 Alan Loth, Fort Dodge, Iowa, made argument for appellant and appellee S. Patti Construction Co. and filed brief.
 John J. Murray and Donald J. Mitchell, of Mitchell, Mitchell & Murray, Fort Dodge, Iowa, made argument for appellee, Betty Lou Epley, Executrix of the Estate of Harvey H. Epley and filed brief.
 Evart Mills, of Mills & Mills, McPherson, Kan., made argument for appellees, Florence & Hartzell and Evart Mills and Michael T. Mills, of Mills & Mills, McPherson, Kan., filed brief for appellees, Florence & Hartzell and Alliance Mut. Cas. Co.
 Before VOGEL, MATTHES and RIDGE, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 These two consolidated actions arise out of the injury and death of an employee during the construction of the federal office building and post office at Fort Dodge, Iowa. For convenience, the various parties will be referred to as they were in the court below. S. Patti Construction Company (hereinafter referred to as Patti) was the general contractor for the construction of the building at which the accident occurred. Carstens Plumbing & Heating Company (hereinafter Carstens) and Florence & Hartzell, Inc. (hereinafter Florence) were among the subcontractors on the project. Harvey H. Epley, the deceased, out of whose injuries and death the various claims arose, was an employee of subcontractor Florence.
 
 
 2
 In the first instance, plaintiff Betty Lou Epley, a citizen of Kansas and executrix of the estate of her husband, Harvey H. Epley, brought suit for damages for the wrongful death of her husband in the United States District Court for the Northern District of Iowa, Central Division, against Patti, a Missouri corporation. Diversity of citizenship and the amount involved justified federal court jurisdiction.
 
 
 3
 Alliance Mutual Casualty Company was Florence's insurance carrier, paid workmen's compensation benefits to Mrs. Epley in accordance with the law of Kansas, and claimed subrogation as to any recovery herein up to the amount of its payments. After the original suit by Betty Lou Epley against Patti, Patti in turn sued its subcontractors Carstens and Florence on a third-party complaint. Florence also brought suit against Carstens on behalf of the estate of Harvey H. Epley and their workmen's compensation insurance carrier, Alliance. Patti also sought contractual and common law indemnity against Carstens, one of its subcontractors.
 
 
 4
 The case was tried to a jury which, in responses to special interrogatories submitted to it, found both Patti and Carstens guilty of negligence which proximately resulted in Epley's death. The jury assessed damages in the sum of $39,000 and judgment in that amount was entered on April 7, 1964, against both Patti and Carstens and in favor of both Betty Lou Epley and Florence. Judgment was also entered on the Patti indemnity claim against Carstens, such issue having been withdrawn from the jury and decided by the court. The court's opinion is published at 228 F.Supp. 1. Third-party defendant Carstens and defendant and third-party plaintiff Patti have perfected these appeals.
 
 
 5
 On March 24, 1961, the day of the accident, Patti was the general contractor for the construction of the building in question. On that date construction work was completed and the masonry work was virtually completed. Plastering and lathing crews were working in the building, as were the plumbers. Patti had erected a materials hoist on the east side of the building. The hoist was owned by Patti, which considered it an expensive piece of equipment valued at $10,000 to $15,000. The hoist was of open frame construction and was used to raise and lower materials and equipment to the various floors and roof of the building. It was not used as a personnel carrier. The erection of the hoist started in the latter part of July 1960 and its tower or shaft was extended from floor to floor as the building went up. The tower was built of heavy steel tubing and had main tubings that ran vertically at each of the four corners. There were steel "X" bracings between. The platform or cage portion of the hoist was about six feet square with an "I" beam extending up each side and across the top. There were guides on each side of the platform. The flooring of the platform was of plywood or planking. The tower of the hoist was approximately three feet from the east wall of the building. There were openings in the wall at each floor level immediately to the west of the tower. These openings later were made into windows. There was a gangplank or planking at each opening extending from inside the building to the hoistway; this served as a flooring for the three feet between the building and hoistway. It was used by workmen when loading or unloading materials from the hoist platform. There were removable barriers on each floor at each opening to the hoist.
 
 
 6
 The materials hoist was controlled by a cable attached to the top of the hoist cage or platform extending upward to a pulley at the top of the tower and then running down the side of the hoist tower to a drum unit operated by a General Motors diesel engine and located approximately 40 to 75 feet north of the hoist. The diesel engine, cable drum unit and controls were kept locked within a shack and the key remained in the exclusive possession of the project foreman engineer or superintendent of Patti on the jobsite.
 
 
 7
 The diesel engine turned the drum unit and as the cable was wound around the drum unit, the hoist cage or platform would be raised and conversely, as the cable was unwound from the drum unit, the hoist platform would be lowered. The hoist platform could be locked in position at a desired floor level by a cog and the diesel engine then switched off. Thereafter, in order to raise or lower the platform, the diesel engine would have to be started and engaged in order to lift the platform slightly to enable the operator to remove the safety cog. The descent was controlled by a mechanical foot-brake. There were safety cogs on the cage of the platform itself; these were designed to catch the guard rails and stop the descent of the platform completely should the platform descend in a "free fall". There was, however, testimony that the hoist had no device that would automatically halt the descent if it exceeded a certain speed. There was a spring-like device that would stop the descent if the cable broke.
 
 
 8
 The windows on the east side of the building were in place and were key locked. The key was kept in Patti's office at the jobsite. The windows were kept closed to aid in controlling the temperature for the plastering work being done on the second floor.
 
 
 9
 A plaster mixer apparatus and pump with a two-inch pipe running from the pump motor to the second floor window immediately adjacent to the hoist tower was located on the ground near the base of the hoist tower. Plaster materials were being pumped to the second floor and there used by the plastering crew under the direction of the foreman, Harvey Epley, the deceased.
 
 
 10
 From the time that the hoist was erected until approximately March 1, 1961, it was operated by Floyd Disbrowe, an employee of Patti. Disbrowe's only duties were to operate the hoist. However, since there was not a great deal of hoisting to be done after March 1, 1961, Disbrowe was called in only if there was a substantial amount of hoisting to be done. On lesser jobs Battenberg operated the hoist. Battenberg was project foreman, engineer or superintendent for Patti at the jobsite.
 
 
 11
 There were no bells, whistles or other signals used when lowering or raising the hoist platform. There was no telephone communication between the building and the hoist operator's shack. There was no rope or chain tied or dangling below the platform that might give an indication that the platform was being lowered, and there was no evidence that there had ever been. The operator had a clear view of the hoistway from the position of operator in the shack. Persons on the walkway between the building and the hoistway also had a clear view of the operator.
 
 
 12
 The materials hoist was erected by Patti for its own use as well as for the use of its subcontractors. Patti felt it would have been "incommodious to the operation of the job as a whole if each subcontractor brought in their own hoist and an operator". It was the general practice for the general contractor to furnish the hoist at a construction site.
 
 
 13
 Generally a charge was made by Patti to the subcontractors for the rental or use of the hoist and the operator. A timekeeper employed by Patti kept a record of the time that the hoist and the operator were being used for subcontractors. The timekeeper would determine the charge to the subcontractor by the time involved and would send the charges to Kansas City, Missouri, for billing. No charges were ever made by Patti to Carstens for use of the hoist and operator on March 24, 1961. There was testimony that there should have been.
 
 
 14
 On the day of the accident Russell Windler, foreman for Carstens, went to the office of the general contractor Patti to inquire about use of the hoist for their materials. He was told to load the hoist and Battenberg would operate it himself. At sometime between 11 and 11:30 a.m. Battenberg operated the hoist and raised the load to the roof. The safety cog was put in place and the diesel motor switched off. The shack was again locked and the key put in Battenberg's pocket and he continued with his other duties. The materials hoist was at the roof level when Carstens' employees completed their climb up the stairs and the hoist was unloaded by Carstens' employees in about 15 or 20 minutes. Word was then sent to Battenberg that the hoist was unloaded and could be lowered to pick up more material. Battenberg unlocked the shack and started the diesel engine, raised the hoist a few inches, released the safety cog and then proceeded to lower the platform. The platform controlled by the use of the footbrake descended at a speed of between 5 and 7 feet a second, according to Battenberg. Others described the descent as a "free fall", "all of a sudden", "descended in a split second", it "dropped".
 
 
 15
 Epley, the deceased, was working with his crew, of which he was foreman, on the second floor of the building. Shortly before the noon lunch break Epley went onto the platform near the hoist to call down to one of his workmen on the ground to direct that the workman pump water through the pipe in order that the plaster mixture would not harden in the pipe during the noon lunch period. Epley was leaning into the shaft "out in the path of the hoist". While Epley was on the catwalk between the building and the hoist shaft, Dean Derrig, an employee of Florence, went onto the catwalk with Epley and obtained a trowel from Epley's hip pocket and was returning to the building when the descending platform struck Epley, who was leaning into the shaft in the path of the hoist as it was coming down. At the time Epley was struck by the platform, he was bent over or stooped down with his upper body extending out into the shaftway. It took approximately 20 seconds for Derrig to get the attention of Battenberg to raise the platform so that he could pull Epley onto the gangplank. An ambulance was called to the scene and as the attendants and Epley were being lowered to the ground on the materials hoist, again being operated by Battenberg, the platform dropped or fell a distance variously estimated as ten to twelve feet and as one foot. This fall bounced Epley and he was heard to groan. Later that day he died of the injuries received.
 
 
 16
 With reference to the actual occurrence of the accident, the parties stipulated, inter alia, as follows:
 
 
 17
 "* * * While the platform was above him, he [Epley] went out through the window on to the wooden walkway on the second floor, and kneeled there with his head and shoulder within the framework of the hoist, giving or attempting to give instructions to another of Florence's employees who was operating the mixer.
 
 
 18
 "While Epley was in the position above, the hoist was lowered, and struck Epley in the back, inflicting injuries from which he died."
 
 
 19
 In these appeals both Patti and Carstens have raised the question of contributory negligence on the part of the deceased; that is, failure on the part of the plaintiffs to show that Epley was free from contributory negligence. They also claim that Epley was guilty of contributory negligence as a matter of law. Under Iowa law — and we are bound thereby in this case — plaintiff in an action based upon negligence has the burden of pleading and proving freedom from contributory negligence. Chicago, Burlington & Quincy R. Co. v. King, 8 Cir., 1964, 337 F.2d 510, 514; Jenkins v. Bierschenk, 8 Cir., 1964, 333 F.2d 421; Northern Natural Gas Co. v. Roth Packing Co., 8 Cir., 1963, 323 F.2d 922; Illinois Central R. R. Co. v. Stufflebean, 8 Cir., 1959, 270 F.2d 801, 805; Chicago, R. I. & P. R. R. Co. v. Lovejoy, 8 Cir., 1953, 206 F.2d 77, 82; Mast v. Illinois Central R. R. Co., D.C. N.D.Iowa, 1948, 79 F.Supp. 149, 159, aff'd, 8 Cir., 176 F.2d 157; Beezley v. Kleinholtz, 1959, 251 Iowa 133, 100 N.W. 2d 105. Judge Van Oosterhout, speaking for this court in the recent case of Chicago, R. I. & P. R. Co. v. Breckenridge, 8 Cir., 1964, 333 F.2d 990, and in dealing with the law of Iowa, stated at page 991, after citing some of the foregoing cases:
 
 
 20
 "* * * Such cases support the following conclusions: Contributory negligence upon the part of an injured person ordinarily presents a fact issue but if there is a failure of proof on the freedom from contributory negligence issue, defendant is entitled to a directed verdict. If plaintiff is guilty of negligence which contributes in any manner in any degree directly to his injury, recovery is barred."
 
 
 21
 The uncontradicted evidence in this case indicates the following facts:
 
 
 22
 1. Harvey Epley, the deceased, was foreman of the project for Florence & Hartzell, subcontractors on this project, and had been such for a period of at least three months prior to the accident and accordingly was familiar with the operation of the hoist.
 
 
 23
 2. There never had been at any time since the erection of the hoist any bells, whistles or warning devices to indicate when the hoist platform was to be raised or lowered. There was no evidence to the effect that the hoist was changed in this respect during the entire time that Harvey Epley was working at the project site. Accordingly Epley could not have relied on any such warning.
 
 
 24
 3. It could be immediately determined without stepping onto the gangplank area, that is, between the building proper and the hoistway, whether the hoist platform was above or below by looking for the cable attached to the platform cage. If the cable was visible, the hoist platform was either at floor level or below. If the hoist cable was not visible, the platform was above the floor of the observer. Thus Epley could have seen had he looked.
 
 
 25
 4. The operator in the control shack at the controls of the hoist was clearly visible to a person on the second floor runway between the building and the hoistway.
 
 
 26
 5. The motor operating the hoist could be heard running by persons at the second floor gangplank area. This motor was only operating when the hoist platform was to be raised or lowered. At all other times the motor was turned off.
 
 
 27
 6. The hoist was in operation from time to time during the weeks and months preceding the accident and had been raised from the ground level to the roof less than an hour before this accident occurred.
 
 
 28
 7. When the deceased went to the gangplank area to shout directions to his ground crew, he assumed a squatting or stooping position, with part of his body inside the shaft "out in the path of the hoist."
 
 
 29
 8. Epley at the time he came onto the gangplank or platform area on the second floor landing could have seen Battenberg either in the control shack or immediately approaching it. He could have heard the diesel motor which operated the hoist either running or being started. It was the noise of the motor and the plaster pump that required Epley to shout his orders to his workmen below.
 
 
 30
 9. It should have been obvious to Epley that the hoist platform was above him at the time he went onto the platform since the cable was not visible extending downward toward the ground.
 
 
 31
 The only evidence offered in an attempt to excuse or justify the conduct of the deceased was that he needed to shout certain instructions to one of his workmen on the ground; that the windows on the east side of the building were locked and that it was noisy at the jobsite. Plaintiff failed, however, to present any evidence whatsoever which would excuse the deceased's negligence in leaning into the hoist shaftway itself. With these circumstances, we must conclude that there was an utter failure on the part of the plaintiffs to affirmatively establish freedom from contributory negligence on the part of the deceased. Under Iowa law this was plaintiffs' burden; failure to carry that burden prevents recovery.
 
 
 32
 Additionally, we must conclude that the deceased was guilty of contributory negligence as a matter of law. This case is quite comparable to railroad crossing accidents where the person injured drives onto a railroad crossing with a total failure to look, the only difference being that here the track is vertical instead of horizontal. Harvey Epley knew and had known for some months of the existence of the hoistway, its purpose and operation. He could see, had he chosen to look, that the hoist itself was above him. He could see, if he had chosen to look, that Battenberg was in the control shack operating the levers to control the hoist. He could have heard, had he chosen to listen, the diesel motor which would have been a clear indication that the hoist was either being raised or lowered. In addition thereto, there is no evidence whatsoever for justifying his placing part of his body in the hoistway, when he had a place of safety on the gangplank from which to shout his orders to his employees. We think the minds of reasonable men may not differ on the proposition and that the deceased was guilty of contributory negligence as a matter of law.
 
 
 33
 The trial court, in denying appellants' motions for judgment notwithstanding the verdict or for a new trial, cited and relied on certain cases which we find inapplicable to the one at bar. The first such case is Campbell v. Haughton Elevator & Machine Co., 1925, 233 Mich. 157, 206 N.W. 498, which the trial court refers to as "very nearly the same case as the present one". We do not find the cases comparable. In Campbell the injured employee had been sent into an elevator shaft by his employer to do some plastering work. Arrangements had been made by the employer with the defendant to assure that the elevator would not be operated while plaintiff was working in the shaft. Contrary to such arrangements, the elevator was operated and plaintiff was injured. Quite correctly the Supreme Court of Michigan held that the questions of negligence and contributory negligence were for the jury and affirmed a finding in behalf of the plaintiff. In the case at bar, Epley was not ordered into the hoistway shaft nor was it necessary for him to be there. He chose that dangerous spot from which to give his orders to an employee on the ground rather than do so from the safe gangplank between the building proper and the hoistway.
 
 
 34
 There is also cited by the trial court the case of Smith v. Kedney Warehouse Co., 1936, 197 Minn. 558, 267 N.W. 478, 269 N.W. 633. That case involved a situation where plaintiff walked into an unguarded elevator pit. The plaintiff had been a frequent visitor on the premises and he was relying on the fact that the elevator gate would be in place. The Supreme Court of Minnesota held that the plaintiff could reasonably have relied upon the gate being closed on the occasion in question and that the evidence of contributory negligence on his part was a matter for the jury's determination. We do not believe the Minnesota case is any support for plaintiffs' position in the instant case. Other cases cited in support of plaintiffs we find unpersuasive.
 
 
 35
 It is contended in behalf of the plaintiff Florence that plaintiffs were entitled to the benefit of the Iowa "no-eyewitness" rule. The rule contended for has been stated by the Iowa court in Hoffman v. Monroe Welding Supply Co., 1962, 253 Iowa 591, 113 N.W.2d 237 at page 240:
 
 
 36
 "The rule is well settled in this state that in the absence of eyewitnesses or of any obtainable evidence as to what the deceased did or failed to do, by way of reasonable precaution for his own safety, at or immediately before his injury, there arises an inference that he, prompted by his natural instinct, was in the exercise of due care for his own safety. Paulsen v. Haker, 250 Iowa 532, 95 N.W.2d 47; Riedesel v. Koch, 241 Iowa 1313, 45 N.W.2d 225; Spooner v. Wisecup, 227 Iowa 768, 288 N.W. 894; Edwards v. Perley, 223 Iowa 1119, 274 N.W. 910, and many others found in the citators. The purpose of the rule we have recognized is to avoid any injustice due to the severe burden on plaintiff to plead and prove freedom from contributory negligence in order to recover in this type of action when there are no survivors or witnesses who can tell what the plaintiff's decedent was doing immediately prior to the accident."
 
 
 37
 In the same case, however, the Iowa court also stated, beginning at page 239 of 113 N.W.2d:
 
 
 38
 "As the name implies, the no-eyewitness rule may not be invoked if there is an eyewitness to the care exercised by the plaintiff's decedent. Where there is direct evidence as to his conduct just prior to and at the time of the accident, there is no room for an inference that he took reasonable precautions for his own safety. It may then be judged from what he in fact did, rather than from an inference as to what he might have done. Vandello v. Allied Gas and Chemical Co. [252 Iowa 1313], 110 N.W.2d 232; Lingle v. Minneapolis & St. L. Ry. Co., 251 Iowa 1183, 1187, 1188, 104 N.W.2d 467, and citations; Vol. 43, Iowa L.Rev. 57, 58, and citations; Vol. 6, May, 1957, No. 2, Drake L.Rev., 101. To receive the benefit of this rule it was incumbent upon the plaintiff to satisfactorily establish that an eyewitness to the conduct of his decedent was not obtainable. Merchants Transfer & Storage Co. v. Chicago, R. I. & P. Ry. Co., 170 Iowa 378, 393, 150 N.W. 720, 725."
 
 
 39
 It is contended by Florence that the no-eyewitness rule was applicable herein and that it should prevent this court from declaring Epley guilty of contributory negligence as a matter of law. The trial court did not give the no-eyewitness rule in its instructions to the jury, and we think for very good reason. The deceased was seen immediately before and immediately after the accident and it was known that he had placed himself in the shaftway in the path of the descending hoist, where he had to be in order to be struck and injured by it. Plaintiffs here were not entitled to an application of the Iowa no-eyewitness rule.
 
 
 40
 Determining, as we do, that plaintiffs may not recover, we do not reach the various other questions raised by the numerous parties hereto. They are accordingly pretermitted.
 
 
 41
 Reversed with directions to enter judgments in accordance with this opinion.